HAWKINS, Justice,
for the Court:
State Educational Finance Commission (EFC) has appealed from a decree of the Chancery Court of Jackson County reversing the EFC’s decision to reject a site location proposed by the Jackson County School District for a high school in one of the District’s attendance centers, and authorizing the District to proceed with construction of a school on the proposed site. We affirm.
The Jackson County School District (District) comprises most of the land area of Jackson County, and covers the entire county from north to south until the more populous coastal areas are reached.[1]
The District has three attendance centers: St. Martin, Van Cleave and East Central. St. Martin’s is on the west side of Jackson County. The north boundary of St. Martin’s begins approximately seven (7) miles south of the north line of Jackson County, and the north nine (9) miles of this attendance center are four (4) miles in width. As the attendance center continues south there is a progressive widening to its south boundary, which joins Ocean Springs. The south mile and one-half (1%) of the attendance center is approximately eight (8) miles wide east and west.
The present St. Martin high school is located in the extreme southwest corner of the attendance center, an area which is heavily populated and commercial. The school building on this site was destroyed by fire, and the district has been required to utilize 28 portable classrooms.
The Jackson County Board of Education in 1978 determined a substantial building program was needed for the entire district, that new high school buildings were needed for the East Central, Van Cleave and St. Martin attendance centers, and a new vocational educational building was also needed. Following the statutory procedure a proposed bond issue of 9.9 million dollars was submitted to the voters in March, 1979, which failed to receive the affirmative vote of 60% of those voting. A second attempt to secure passage of the bond issue in May, 1979, likewise failed for the same reason. The third attempt on April 15, 1980, succeeded when the voters of the district approved the bond issue. The voters in St. Martin were informed the board proposed to locate a new St. Martin high school in the southeast quarter of section 16, township 7 south, range 8 west, and the voters in the St. Martin attendance center area voted overwhelmingly — over 80% — in favor of each of the proposed bond issues.[2]
Following approval by the District of the bond issue, the board presented requests for approval of the four sites for construction of the new school buildings in the District, and the applications were formally presented at the August 17, 1981, meeting of the EFC, at which time all sites were approved except the site for the St. Martin High *682 School.[3] The minutes of this meeting recite the following:
In the executive session, the Commission:
(1) received reports from Commissioners Roach and Coleman and the Executive Secretary, all of whom had made official visits to the proposed site;
(2) examined the communication from the Jackson County Chancery Clerk regarding the Board of Supervisors’ pledge to build the necessary road and bridge to the proposed site;
(3) examined the report of the Gulf Regional Planning Commission regarding population projections for the St. Martin attendance area; and
(4) reviewed the presentations which had been made in open meeting by the Jackson County School officials.
The minutes further recite the consensus of the Commission was that additional documented factual information was needed, and the Commission thereupon postponed a determination on the proposed St. Martin High School site until the September 21, 1981, meeting of the Commission.[4]
On August 26, 1981, county superintendent Jimmy Smithie wrote the Executive Secretary of the Commission enclosing detailed documentation why the Jackson County School Board preferred and had chosen the particular site for its new school.
Enclosed with the letter from Superintendent Smithie were:
(1) Correspondence from the Ocean Springs Lumber Company of the availability of land for housing, correspondence from a building development firm of additional land for residential construction, and a letter from the president of the First Mississippi National Bank commending the site and stating there were several large subdivisions within walking distance of the site, others planned, and the bank had acquired one subdivision adjacent to the proposed school location which contained 103 lots on which the bank planned construction of homes.
(2) A letter from the principal of the St. Martin High School setting forth the advantages of the proposed site.
(a) He stated control could be exercised over the type of buildings close to the school, avoiding undesirable businesses catering to children as well as undesirable influences around the campus for selling drugs. Next he listed that by being away from the mainstream of traffic there could be some safety control of the traffic on campus, and undesirable elements could be discouraged from coming on the campus.
(b) He answered the objection to the location of the site by stating the transportation of students would not constitute as big a problem as had been anticipated. According to Mr. Rivers, approximately 80 students would be in a work study program, another 80 students would be in the vocational shop program, 50 students in band, and 50 engaged in football. In his opinion, many of these would have a car or a ride. His opinion was there would be in excess of 200 cars driven to the campus, and when it was taken into consideration that many of these ears would have student passengers, he anticipated busing about 400 of a student body in excess of 700.
(c) Another advantage he listed was the unlimited amount of land for expansion and extracurricular activity.
*683 (d) He said further there were several routes students would have in going to and coming from school.
(e) Finally, Mr. Rivers stated that while more convenient locations for the school could be found, the main thing for a school was to educate the children, and his opinion was this site would allow St. Martin to accomplish this goal. There would be fewer distractions and a reduction in the danger of an area of easy accessibility to the public.
(3) A letter from C. R. Slaughter dated August 25, 1981, with accompanying documentation, exhaustively detailed reasons for desirability of this site:
(a) He said that the transportation costs should be compared with the fact the site would not cost anything, and that there had been no computation of transportation costs.
(b) The proposed site was destined for continued development which would likely be residential. A right of way had been purchased by the State Highway Department to make an intersection of the Fort Bayou road and Interstate 10, a major interchange for Ocean Springs, which would result in another road connecting Interstate 10 with U.S. Highway 90, and which proposed roadway would be near the school site.
(c) He reviewed the trends in population growth and noted that supervisor’s district 4 encompasing this site is the fastest growing area of Jackson County. He also noted that the St. Martin — North Ocean Springs area would very likely grow in population and density towards the east, taking in the proposed school site. This site would probably never be the center of the population, however.
Mr. Slaughter’s letter revealed five additional proposed sites had been considered by the school board and he detailed why each of these five proposed sites compared unfavorably with the site the board desired to use for their new high school. These five alternate sites were marked on a map accompanying the letter. The site chosen by the school board contains approximately two hundred acres.
The Educational Finance Commission at its September 21,1981 meeting disapproved the proposed site. The official minutes of this meeting recognized the advantages of the site to be its topography, ample land, and no acquisition cost for the site. The minutes further recognized a survey had shown “49% more students would be closer to the new proposed school site than the old site.”[5]
The disadvantages listed by the EFC minutes were as follows:
(1) The proposed site is located in the extreme south-eastern part of the attendance area.
(a) It is approximately six (6) miles (in a straight line) from the south-western corner of the attendance area, and the south-western part is the most heavily populated part of the attendance area.
(b) It is only two (2) miles from the south-eastern corner of the attendance area, and the south-eastern part is very sparsely populated.
(c) It is approximately one-half (%) mile from the southern boundary of the attendance area, but approximately fifteen (15) miles (in a straight line) from the northern boundary of the attendance area.
(d) It is within two (2) miles of the farthest point from the geographical center of the attendance area.
(2) The proposed site is located outside the populated part of the attendance area.
(a) If the school were presently located on this site, every student would be legally entitled to transportation at public expense.
*684 (b) The site is located in the south-eastern. corner of the attendance area, while the most densely populated area is the south-western part.
(c) The site is located at almost the farthest point from the students who live in the northern part of the attendance area.
(d) The only authoritative study of the population trends in the attendance area which the Jackson County School Board presented was prepared by the Gulf Regional Planning Commission. It shows that the area immediately around the proposed site will increase in future years, though slowly. However, the population in the south-western part of the area will increase even more. By reference, said study is made a part of these Minutes.
(3) Access roads are inferior. While assurances have been given that the access roads will be constructed, there is no official, binding guarantee that the improvements will actually be made.
In summary, the three objections of the EFC to the proposed site were location, sparser population and accessibility by road.
Following the unfavorable decision of the EFC and its rejection of a motion of the County School Board to reconsider, an appeal was taken to the Chancery Court of Jackson County pursuant to Mississippi Code Annotated Section 37-45-51. In a carefully articulated opinion, the chancellor reversed the EFC and approved the site chosen by the County School Board, with decree on November 13, 1981. EFC perfected its appeal to this Court.
The County School Board could and should have made a better record in this case. Mississippi Code Annotated Section 37-45-37 (1972) imposed upon the Board the duty of providing a court reporter for its hearing before the Commission. See also State Board of Psychological Examiners v. Coxe, 355 So.2d 669, 671 (Miss.1978), wherein we have informed counsel of their duty in all administrative proceedings to see that a record is made. We also add our disapprobation of the presentation to the chancellor of documents which have not been presented to the EFC prior to its decision, as was done in this case. We have not considered these extraneous documents. Id. at 670.
Sufficient record has been made, however, from the minutes and the bill of exceptions for us to consider without being faced with a naked presumption of correctness of the decision of an administrative body. County Board of Education of Alcorn County v. Parents and Custodians of Students at Rienzi School Attendance Center, 251 Miss. 195, 168 So.2d 814 (1964).
We have before us the conclusions reached by two administrative bodies, both charged with the duty of making the best decision possible in the interest of the present and future school children of this school district. We attribute the highest motives and good intentions to each.
Three statutes and our common law relative to appellate review of decisions of administrative bodies govern this case. The statutes, or pertinent portions thereof, are as follows:
Section 37 — 45-28. Subject to the provisions of any applicable statute, the commission shall formulate policies and approve or disapprove plans for the location and construction of all necessary elementary and secondary school buildings.
Section 37 — 47-27. All capital improvements by any school district which are financed in whole or in part with funds received from the state public school building fund pursuant to an application approved by the commission, shall be constructed by contract entered into and awarded by the board of trustees or other governing body of such school district. The awarding of such contract shall be in the sole province of such board of trustees or other governing body except as is herein provided. No such contract shall be entered into unless and until the site for the location of and the plans and specifications for the construction of the capital improvements shall have been approved by the commission .... (emphasis added).
*685 Section 37-7-315. ... If any change or alteration of the location of a school building or attendance center shall involve the construction of new school facilities, or the making of additions to, or the major repair, alteration, or renovation of existing facilities, then such change or alteration shall not be effective until same shall have been submitted to and approved by the state educational finance commission and by the county board or boards of education .... (emphasis added).
Our appellate review is limited to a determination of whether the EFC decision (1) was supported by substantial evidence; (2) was arbitrary or capricious; (3) was beyond the power of the commission to make; or (4) violated some statutory or constitutional right of the complaining party. State Board of Psychological Examiners v. Coxe, supra; Mississippi State Tax Comm’n. v. Mississippi-Alabama State Fair, 222 So.2d 664 (Miss.1969); Loftin v. George County Board of Educ., 183 So.2d 621, 623 (Miss.1966). In this case we will only consider whether the rejection of the proposed site by the EFC was supported by substantial evidence.
The executive secretary of the EFC informed representatives of the County School Board of his misgivings about the proposed site during an inspection in July, 1981, but withheld any opinion that the site would be rejected. At its August, 1981 meeting, the EFC did not disapprove the site, but rather told the Board to secure additional documented factual information prior to the scheduled September, 1981 meeting of the EFC. This record reveals the County School Board fully complied with this requirement of the EFC by submitting reports containing specific, documented information by professional personnel and comments by reputable firms and citizens of Jackson County.
The County School Board gave excellent reasons for its site proposal, fully answering the objections of the EFC, and stating precisely why this site, though somewhat “off the beaten path”, was preferable. The Board pointed out and listed five additional sites which it and the architect considered, together with the many factors which were taken into consideration in a coastal county with a varying, fast-growing population.[6] The record shows the County School Board gave strong, cogent, specific and compelling reasons for the location of the school on the proposed site.
The objections of the EFC, which remained essentially the same as originally expressed by the executive secretary, were general with somewhat dogmatic conclusions. The record does not reflect whether the EFC considered the documented evidence presented to it in the letter from Superintendent Smithie.
The Highway Department map of Jackson County shows the proposed site to be approximately two (2) miles south of Interstate 10 and one (1) mile north of Highway 90, two of the busiest highways in Mississippi. The entire southern portion of this attendance center will increase in population over the years, but without the school it is anticipated that the population in the southwest portion, where the school is presently located will have a considerably faster growth rate. On the other hand, the development of the area in which the proposed school site is located will probably be primarily residential, which is precisely the type of growth the District would prefer for the area in which its high school is to be located.
We can give no special credence to the objection that the proposed site at present does not have adequate access roads. The map shows that roads do exist on the east, south and west sides of the property. The school itself will be justification for improvement of ingress and egress roads.
*686 Finally, it should be noted there was no secret about the proposed location of the new high school in St. Martin Attendance Center. The newspapers repeatedly informed the public where the County School Board proposed to locate the school. The voters in this area, with this information before them, by at least an 80% affirmative vote on three occasions approved the proposed bond issue.[7]
The decision of the County School Board to locate the high school on this proposed site was supported by substantial evidence, and the reason for rejecting this decision by the EFC was not supported by substantial evidence. We therefore affirm the decree of the Chancery Court of Jackson County.
AFFIRMED.
PATTERSON, C. J., SUGG and WALKER, P. JJ., and BROOM, ROY NOBLE LEE, BOWLING, DAN M. LEE and DAR-DEN, JJ., concur.

. There are also three municipal separate school districts in Jackson County: Ocean Springs, Moss Point and Pascagoula. These municipal separate school districts have nothing to do with this case.

. The first two failures to pass the bond issue by 60% resulted from opposition of the voters in the East Central Attendance Center, concerning matters which have nothing to do with this case.

. In July, 1981, the Executive Secretary inspected the proposed site and informed the county superintendent and several members of the board he had reservations about the proposed site as being too remote from any concentrated population, and that it was not accessible by adequate roads.

. The Board of Education never considered locating the new high school on the same location as the old high school for the reason that it was in a commercial area totally surrounded by laundromats, houses, service stations, grocery stores, and the school would have little control of the surrounding area for the protection of the students. There had been drug problems, and in one instance students were smoking at a service station, which resulted in an explosion.

. We do not know what this means, however. We regret neither counsel for appellant nor appellees could tell the Court just what this statement means. It was the conjecture of counsel for appellees it means three-fourths ([3]/<) of the students would be closer to the new site than the old.

. We do not ignore the contention of the EFC that it could not consider these five additional sites, as no application for their approval was ever presented to the EFC. This is not the point, however. These sites were set forth and described to the EFC for comparison to demonstrate the varied and complicated factors which had to be considered by the County School Board in fulfilling its heavy responsibility to locate a school in this area, which is not typical of the rest of the State.

. We are not unmindful of the hazard the County School Board undertook in telling the people of this attendance center where it proposed to locate the high school. It had no legal authority to locate the school at any site without approval of the EFC, and to inform the voters prior to the bond election the location of the high school was a considerable risk we do not recommend for any school board. Perhaps the Board informed the public the location was tentative and subject to the EFC’s approval. This again, however, is not the point before us. Rather, we think it appropriate to consider — indeed we would be derelict to ignore — that this particular location was the place overwhelmingly approved by the people who must live and send their children to high school at this attendance center, as well as have their property additionally taxed to pay a considerable bonded indebtedness.